```
 1     STATE OF SOUTH CAROLINA  )
                                )    IN THE COURT OF GENERAL SESSIONS
 2     COUNTY OF SPARTANBURG     )

 3

       Timothy Wilbanks,        )
 4                              )    TRANSCRIPT OF RECORD
                 Applicant,     )    2006-CP-42-3107
 5     -vs-                     )
                                )
 6     State of SC,             )
                                )    June 17, 2011
 7               Respondent.    )    Spartanburg, South Carolina

 8

 9

10

11     B E F O R E:

12           HONORABLE J. MARK HAYES, II, JUDGE

13

14

15     A P P E A R A N C E S:

16           C. KEVIN MILLER, ESQ.
             Attorney for the Applicant
17
             SUZANNE H. WHITE, ESQ.
18           Attorney for the Respondent

19

20

21

22

23                           Margaret A. Woods
                             Circuit Court Reporter
24

25
```

ORIGINAL

1

1                                     INDEX

2   WITNESSES                                                    PAGE

3   JAMES E. HATCHER

4     Direct examination by Ms. White                              3

5     Cross-examination by Mr. Miller                             17

6     Redirect examination by Ms. White                          36

7   Certificate of reporter                                      39

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JAMES E. HATCHER - DIRECT EXAMINATION BY MS. WHITE

1      MS. WHITE:  Good morning, Your Honor.

2      THE COURT:  Yes, ma'am.

3      MS. WHITE:  Your Honor, this is the case of Timothy

4   Wilbanks vs. the State of South Carolina, it's Case Number

5   2006-CP-42-3107.  Your Honor, we took or -- testimony

6   originally November 1st of 2010 on this case, the applicant's

7   testimony, and held the record open for either deposition or

8   testimony from his trial attorney at the time, Mr. James

9   Hatcher, who was living outta state and working out of the

10  country for a good portion of the time, he has just moved back

11  so we have scheduled this to try to get his testimony today

12  and I'm not sure if Mr. Miller wants to call him or if ya'll

13  had rested your case and want me to call him, I'll -- okay so

14  if you're ready to proceed, Your Honor, ---

15     THE COURT:  Yes, ma'am.

16     MS. WHITE:  --- the State would call Jimmy Hatcher to the

17  stand.

18     THE COURT:  C'mon around, sir.

19                    JAMES E. HATCHER, having been

20  first duly sworn, testified as follows:

21  DIRECT EXAMINATION BY MS. WHITE:

22  Q.   Mr. Hatcher, if you could just state your name for the

23  record.

24  A.   James E. Hatcher.

25  Q.   And gi -- if you could, give us a little background on

3

JAMES E. HATCHER - DIRECT EXAMINATION BY MS. WHITE

1   how you were involved with this case with Mr. Wilbanks.

2   A.   Yes, I was appointed to represent Tim, I was employed at

3   the time at the Spartanburg County Public Defender's office

4   and I was appointed in 2003.

5   Q.   Okay.  And at that point how long had you been practicing

6   law, do you recall?

7   A.   I was licensed in 1989.

8   Q.   And had most your work been in criminal defense or civil

9   or ---

10  A.   Primarily I'd started in the military and that was, that

11  was 90 percent criminal work and then I worked for the

12  solicitor's office in two different counties and then I went

13  to the public defender's office beginning in 2000.

14  Q.   Okay, and obviously it's been a long time since you

15  handled the case, I know you've had a chance to review your

16  file and then also review the testimony that was offered, do

17  you recall the facts of the case and in any meetings with

18  Mr. Wilbanks in discussing strategy?

19  A.   Yes, I I met with Tim at the jail where he was being

20  held.

21  Q.   And at the time do you recall what your discussions were

22  involving any defense to this case?

23  A.   Yes, Tim was adamant from the first day that I met him

24  that this was all a mistake and that the investigators had

25  jumped to conclusions and that he was -- had been erroneously

4

JAMES E. HATCHER - DIRECT EXAMINATION BY MS. WHITE

1    arrested and charged.

2    Q.    And so at that point in discussing with him did ya'll

3    develop a strategy for a defense?

4    A.    Yes, it was essentially a case that would revolve around

5    attacking the eyewitness testimony and that basically they had

6    gotten their ID wrong.

7    Q.    And in mentioning ID Mr. Wilbanks raised the issue I

8    believe of having a couple of issues regarding the

9    identification in this case and one point there was a photo

10   lineup in which the eye witnesses, two I believe, one

11   immediately, one after a little bitta time identified or

12   picked Mr. Wilbanks out of a lineup; do you recall any

13   conversations or any review of that?

14   A.    Yes, Tim and I went over a lot of things in the case but

15   one of the things that we focused on was the photo lineup that

16   had been presented to three different eyewitnesses.

17   Q.    And in your experience or practicing law, did you find

18   any issues with the lineup?  Were there any issues that you

19   felt you would be able to raise at trial?

20   A.    Well just some, just the normal arguments when it comes

21   to suggestiveness and it was a as I recall a "six-pack", what

22   we call a "six-pack lineup" so that it limited the witnesses.

23   One of the things I tried to establish at trial was that they

24   were not given the opportunity to leaf through a a mug shot,

25   ya know, an array of mug shots, rather they were just

5

JAMES E. HATCHER - DIRECT EXAMINATION BY MS. WHITE

1    presented with this one "six-pack" and I as I recall the

2    photograph of Tim was not necessarily a current photo so we we

3    focused on some of those things.

4    Q.    Okay.  Were there any -- did you believe that -- I guess

5    other than attacking it at trial, was there anything with the

6    identification that you felt was improper that you really felt

7    that ya'll would be able to get it I guess suppressed?

8    A.    Well right, I'm sorry.  Yeah, we we initially attacked it

9    in the, in a suppression hearing to start with and what I

10   believe my main focus was that I got the detective to

11   acknowledge that he had in fact received very specific

12   descriptive material specifically that being that the robber

13   had scars on his face and Tim and I thought that was

14   particularly noteworthy since he doesn't have scars on his

15   face and we zeroed in on that and I in fact got the detective

16   to acknowledge that I think his position was that he had

17   prepared the "six-pack" before he got that information but

18   then he finally agreed with me that once he had that

19   information he did not do anything to improve the lineup to

20   make it consistent with the eyewitness testimony and based on

21   that I moved for the lineup to be suppressed.

22   Q.    And was that motion successful?

23   A.    Unfortunately not.

24   Q.    And in fact I believe he was picked out by one of the

25   eyewitnesses immediately, is that correct, by -- on the lineup

6

JAMES E. HATCHER - DIRECT EXAMINATION BY MS. WHITE

1    I guess originally?

2    A.   I believe it was, it was a a young man that was the first

3    one to be called in and if I'm not mistaken he actually

4    pointed at another person in the lineup and then with the h --

5    the detective had a little conversation with him, so to speak,

6    and and asked, basically suggested that he take another look,

7    maybe not worry about things like hair and ultimately that

8    that witness then we were told picked Tim's photo.  I believe

9    the next witness to come in was a young lady and I think at

10   first, I think at first she said she didn't see the the

11   suspect in the lineup and then again being encouraged to look

12   at it a little longer she selected Tim's photograph and then

13   the last supposed eyewitness came in and basically said he was

14   in the back of the store and he didn't see anybody so I I

15   think that fairly summarizes what the witnesses said.

16   Q.   Okay, and did you have the chance to cross-examine each

17   of those witnesses during the trial?

18   A.   Yes, I did.

19   Q.   And were you able to bring out some of that I guess

20   uncertainty perhaps with identification?

21   A.   Yes, well particularly with -- well both with the the man

22   who had originally picked someone else, he acknowledged that

23   on the stand as I recall and then the young lady.  Again, that

24   she was the one that was the source of, she was the one that

25   was closest to the storefront and had direct contact with the

7

JAMES E. HATCHER - DIRECT EXAMINATION BY MS. WHITE

1    person robbing the store and from the very beginning her

2    description to 911 was this man had scars on his face and I of

3    course elicited that from her.  I I actually had Tim, I --

4    the judge allowed me to have Tim come up and actually stand,

5    of course she was in the witness box and I was able to have

6    Tim stand as close as she said he was on that day and of

7    course the jury could see that Tim did not have any scars on

8    his face and I felt like that was pretty effective

9    testimony.

10   Q.   Okay.  In regards to victims' statements, Mr. Wilbanks

11   has alleged that that some of the victims' statements he

12   believed may have been forged or the signatures were forged

13   and that there was some original statements presented at

14   preliminary hearing that were not the statements presented; do

15   you have any knowledge as to that?  Do you recall any

16   conversation about that?

17   A.   I think what he's referring to is the fact that and I I

18   may not have gotten that directly on point out during

19   testimony but I did get from the detective that a lot of,

20   lotta the things written and attributed to witnesses were in

21   fact the handwriting of the detective and and a course in some

22   jurisdictions or departments it's not unusual for a -- for an

23   officer to summarize someone's statement and then ask them to

24   adopt that and sign it but they acknowledge that these

25   statements had been written by an officer, not by the person

8

JAMES E. HATCHER - DIRECT EXAMINATION BY MS. WHITE

1    themselves.  Now I was not a -- I was not successful in in

2    uncovering anything in the way of a forged signature but I

3    don't -- that may have been a failure on my part, I just

4    wasn't able to to find that.

5    Q.    Okay.  There also the same issue was raised in regards to

6    the actual incident report.  I believe there was an incident

7    report, some supplemental incident reports and an allegation

8    perhaps that there was some different handwriting and

9    signatures, is that the same type situation or ---

10   A.    Yes, and that's actually what I I do recall being able to

11   establish through testimony and I think it may have been

12   Detective Bradley but he acknowledged that as the, as the

13   senior, I don't know what they call themselves, but like the

14   senior officer in charge he had the chance to review some

15   reports and in fact prior to presenting this to a magistrate

16   for a warrant he had in fact filled some things in and I was

17   able to get him to acknowledge that yes, that was -- there

18   were some changes in there, the -- all of this wasn't

19   originating from the original writer.

20   Q.    Okay.  Going back to identification real quick,

21   Mr. Wilbanks raised also that he wished that there had been

22   DNA analysis done on the denim shirt that was found in the

23   hotel room where he was arrested; ---

24   A.    Right.

25   Q.    --- you recall any conversation or any thought in regards

9

JAMES E. HATCHER - DIRECT EXAMINATION BY MS. WHITE

1  to doing that?

2  A.   I I do know that we were concerned about the issue of the

3  clothes that Tim had been wearing and the fact that that that

4  we wanted to make sure that we felt that might be significant

5  at trial and it was interesting to me that in the list of

6  evidence that the solicitor had provided to me as part of

7  their responsibilities under discovery rules that there was no

8  mention of these clothes and I knew that Tim had been, ya

9  know, taken under arrest to the jail so I felt like the last

10  person to have control of those clothes would be law

11  enforcement but it was actually through an investigator from

12  the public defender's office that we were actually able to

13  locate those clothes and ultimately I thought one of the more

14  bizarre moments in the trial was the solicitor's office

15  actually served a subpoena on me when they finally figured out

16  that they had overlooked the clothes and I wound up having to

17  turn the clothes back over to them but our, I think the issue

18  we were concerned about was Tim's position was I think that he

19  had a white shirt that was his work shirt from the dealership

20  he worked at and and then there was this other shirt, it was a

21  denim shirt I think, and it was oversized at least for Tim and

22  that's the sh -- and but anyway at the scene where he was

23  taken under arrest both shirts were at that location and for

24  whatever reason the the arresting officers put that oversized

25  denim shirt on Tim and he protested I think early on that that

10

JAMES E. HATCHER - DIRECT EXAMINATION BY MS. WHITE

1    wasn't his shirt.  Now again maybe a failure on my part, I

2    wasn't able to do anything beyond explore under cr -- on

3    cross-examination that there were these other clothes but no,

4    I did not, I was not able to establish anything through DNA.

5    Q.    And he did mention also analysis in regards to detergent

6    on the shirt to identify that that was not the shirt, the

7    detergent that who -- he or his family used; to your

8    understanding would that be anything that would have crossed

9    your mind or worked I guess in this case?

10   A.    Tim Tim was very active in in assisting me in his defense

11   which, ya know, when you have someone who's who's helping you

12   with another setta eyes it's it is helpful but I can't say

13   that I thought every one of his suggestions were on, were on

14   point and it may have just been a disagreement between he and

15   I but I did not see any significant result, ya know, on the

16   case by testing for detergents.

17   Q.    Okay.  Also in regards to identification there was a

18   stolen vehicle that kind of led to that was I guess identified

19   as the car that had been used in the armed robbery, that's

20   kind of what led to ultimately Mr. Wilbanks' arrest I believe

21   locating the car at the, at the motel, talk to me about the

22   the fingerprints.  He's raised an issue that the car was

23   processed or ya'll didn't think it was processed at first then

24   you found out it was; do you recall any issue with that?

25   A.    What I recall is that what I, what I perceived as being

11

JAMES E. HATCHER - DIRECT EXAMINATION BY MS. WHITE

1    sloppy, sloppy handling of the evidence by the, by the police

2    in that they acknowledged in testimony that they hadn't done

3    any forensic testing on the car, that it was not immediately

4    treated as a crime scene, it was not inventoried, it was not

5    fingerprinted and a lotta times from a defense standpoint that

6    that is actually more helpful to me than in the sense that it

7    it helps me show the weaknesses of their case and I know that

8    I was able to establish that.  Now as to whether, and I

9    believe the detective acknowledged that they never took

10   custody of the vehicle, it was taken through some routine

11   method because someone they know who the car belonged to and I

12   think they were just in the process of handling it in a, in

13   more of a normal way whether -- rather than treating it as

14   significant evidence.  Whether or not it was ultimately

15   fingerprinted I can't remember.

16   Q.   Okay.  There were a couple of other issues about video of

17   the motel or where the car was parked; was that anything that

18   was introduced into evidence to your knowledge, a video or ---

19   A.   What I recall is by about the last day of trial we were

20   able to get a video.  The judge agreed to let us play this

21   video.  I don't know if it was offered actually by the State

22   or by us.  We knew the tape existed, it seemed like we'd had

23   to do some back and forth to finally get it, ya know,

24   displayed or shown.  I think that the detectives' position all

25   along was that they didn't have any video and they didn't have

12

JAMES E. HATCHER - DIRECT EXAMINATION BY MS. WHITE

1    any audio.  Through cross-examination I think and actually in

2    the *Jackson v. Denno* hearing I finally figured out that yeah,

3    there was a a video running because it was stationary video on

4    on one of the patrol vehicles that I think when they took Tim

5    into custody initially it just kicked on automatically, I d --

6    I I'm not sure but there mighta be -- but then they said the

7    audio wasn't working right so they didn't think the video was

8    of any significance but we ultimately played it.  Tim thought

9    there were some things of significance in the vi -- video, I,

10   ya know, we were trying to establish that this vehicle was

11   located some distance from the room he was in and we didn't

12   know how on earth they were making this leap of logic as to

13   him being the driver of that vehicle 'cuz, ya know, he was

14   just one occupant of who, ya know, however many occupants in

15   this hotel.

16   Q.    Okay.  In regards to failure to call any witnesses, do

17   you recall Mr. Wilbanks telling you that there were any

18   witnesses that he wanted you to call that you did not call on

19   his behalf?

20   A.    Well, I recall that we searched in vain for one or two

21   people that he told us were significant and I think we were

22   dealing at least with one of 'em with a street name and the

23   other one I think we had a full name but we never could track

24   that person down either so was I -- I wasn't successful in

25   producing all the people that he said, ya know, could be

13

JAMES E. HATCHER - DIRECT EXAMINATION BY MS. WHITE

1    helpful to us but I certainly tried as, ya know, with all the

2    resources I had to track these people down and so yeah,

3    there's probly one or two that he wanted there that wasn't.

4    Q.   Okay, and talk to me about the jury charges.  At one

5    point yet there was some discussion on the record about a

6    strong armed robbery charge versus an armed robbery charge; do

7    you recall that?

8    A.   Yes, of course Tim was facing the armed robbery charge.

9    I know that as I recall through testimony of one of the

10   officers we were able to establish that in fact I think the

11   warrant may have been originally drafted up as strong armed

12   and the officer acknowledged that but then of course it was

13   indicted as armed robbery and that's what we were at trial

14   for.  The first indication that strong arm might be a

15   possibility was I believe at -- when the State rested and

16   before the resumption of or the presentation of the the

17   defense case during a break the solicitor, Mr. Gowdy, actually

18   came to me and at that point offered us, he told me he was

19   prepared for Tim to be off -- he was prepared to offer Tim

20   strong armed robbery if we would consider a plea and I asked

21   him for a moment to be able to discuss that with Tim and I I

22   brought him the offer and as I do with with any client and

23   particularly when we're in trial I tell him what the offer is,

24   I tell him my opinion of it, ya know, we talk about where

25   we're at, how the case looks, the pros and the cons of this

14

JAMES E. HATCHER - DIRECT EXAMINATION BY MS. WHITE

1    offer because of course if he pleads he's looking at some jail

2    time and Tim's reaction to this offer was, Well, no I'm not

3    interested in strong armed robbery and in fact I have an offer

4    for the solicitor, you can go tell him I don't want strong

5    armed robbery and my offer is if he agrees to dismiss the case

6    right now I'll agree to not pursue civil charges against

7    him.

8    Q.   So at that point obviously you felt that that was a a no

9    go on the, on the offer and ---

10   A.   Yes, I knew how Tim felt ---

11   Q.   Yes.

12   A.   --- about that offer at that point.  Now and then a

13   course I think you were asking me about jury charges and Tim's

14   position as I recall did not change from his feeling about the

15   offer from the solicitor and he he wanted to go up or down on

16   on the s -- on the armed robbery.

17   Q.   And in fact how did you feel, I mean, did ya'll -- how

18   was your feeling about the case at that point, if you can

19   recall, in regards ---

20   A.   Well, ---

21   Q.   --- to your chances?

22   A.   --- well not that you ever feel super confident in these

23   situations but I felt like we had established a lotta good

24   points and I felt like we had a fighting chance.  I knew the

25   fact that the solicitor comes to me with this offer in the

15

JAMES E. HATCHER - DIRECT EXAMINATION BY MS. WHITE

1   middle a trial tells me that he must think that it's a

2   questionable case and so at the same time of course it's my

3   responsibility to advise the client of the offer and and to

4   make sure that he understands that's something he should

5   consider.

6   Q.    Okay.  And the facts of the case in addition to we've

7   talked about the stolen vehicle, the clothing, the

8   identification, Mr. Wilbanks gave a statement that was

9   essentially considered a confession, is that right?

10  A.    That's correct.

11  Q.    And was that entered?  You mentioned a *Jackson v. Denno*

12  hearing, did ya'll hold a hearing on that statement?

13  A.    We did and I I argued that that statement should be

14  suppressed.  I thought we were able to establish fairly

15  clearly that the statement was actually written by the

16  detective, he acknowledged that; I thought we were also able

17  to establish fairly clearly that Tim was under fairly

18  significant dure -- duress at the time he was being questioned

19  and and I I think my statement was something to the effect of

20  Tim woulda probably agreed to just about anything at that

21  point when he was in custody to try to get himself out of this

22  this situation and but unfortunately the judge did not see it

23  our way.

24  Q.    And that was presented to the jury as ---

25  A.    Yes.

JAMES E. HATCHER - CROSS-EXAMINATION BY MR. MILLER

1    Q.    --- an additional -- okay.

2    A.    Yes.

3    Q.    Alright.

4         MS. WHITE:  I believe that is all the questions I have at

5    this time, Your Honor.

6         MR. MILLER:  If it please the Court, Your Honor.

7    CROSS-EXAMINATION BY MR. MILLER:

8    Q.    Mr. Hatcher, we thank you for being here this this

9    morning, glad you're back in South Carolina.

10   A.    Thank you.

11   Q.    I'm gonna try to go in a a good sequence that may mirror

12   what the Attorney General's office has presented this morning

13   and bear with me as I review my notes and try to move this

14   along.  First issue had to do with the photo lineup and I

15   understand that you argued that that photo lineup was improper

16   and you brought out an issue of of the scarring on Tim's

17   face, ---

18   A.    Right.

19   Q.    --- did you also bring out the issue that the photograph

20   that was used of Tim was several years old and that Tim was a

21   lot thinner at the time that this offense was alleged to have

22   occurred compared with the photograph?

23   A.    I remember that issue being one we were conscious of, I

24   can't tell you how well I established that.

25   Q.    Okay.  Wasn't there however a more important issue with

17

JAMES E. HATCHER - CROSS-EXAMINATION BY MR. MILLER

1    regard to the phot -- photo lineup as regards a photo lineup

2    as opposed to a live lineup?

3    A.    Yes.

4    Q.    And that wasn't argued at trial, was it?

5    A.    Right.

6    Q.    And there was an issue that Tim felt was real important

7    that related to a live lineup and that had to do with a very

8    serious eye condition known as a "lazy eye".

9    A.    Right.

10   Q.    Tim has a very pronounced lazy eye, doesn't he?

11   A.    Right.

12   Q.    And in none of the witnesses' statements whether written

13   by officers or written by the the witnesses did that lazy eye

14   come into play at all, did it?

15   A.    If if you're asking me did that, did did that disclosure

16   come out at trial, it certainly did.  It c -- I think it came

17   out both through the suppression hearing as well as during the

18   the case in chief.  I think initially through Tim's testimony,

19   I had him testimony -- I had him testify for the limited

20   purposes of the suppression hearing and I believe he mentioned

21   it at that point and then I think it also came out through his

22   father's testimony.

23   Q.    But what I'm asking ya is but you did not criticize the

24   State using a photo lineup as opposed to a live lineup that

25   would have potentially shown that significant eye abnormality,

18

JAMES E. HATCHER - CROSS-EXAMINATION BY MR. MILLER

1    the lazy eye.

2    A.    Correct.

3    Q.    Okay.  And you would acknowledge that through a meeting

4    with Tim that it, that it's actually a very prominent feature,

5    is that correct?

6    A.    That's correct.

7    Q.    Okay.  Now with regard to processing the stolen vehicle,

8    did it occur to you that the State did not want to present

9    that as a part of their case because it actually hurt their

10   case?

11   A.    Which which fact?

12   Q.    The the fact that the stolen vehicle was not entered into

13   evidence, the fact that there were fingerprints on the vehicle

14   but they didn't belong to Tim.

15   A.    Yeah, I I I thought I dwelt on that fairly significantly

16   during the case.

17   Q.    And in fact Tim's prints were not on that car, were

18   they?

19   A.    That was never shown.

20   Q.    Now let's go into the victim statements and then the

21   officer's incident report, first with regard to the victim

22   statements.  I believe Alexandra Wolf handled this case at the

23   preliminary, is that correct?

24   A.    That's standard procedure ---

25   Q.    Yes, ---

                              19

JAMES E. HATCHER - CROSS-EXAMINATION BY MR. MILLER

1    A.    --- at the public defender's office.

2    Q.    --- and did you become aware that Tim believed the

3    statements that he was shown by you as you were preparing the

4    case were different than the statements that he had been

5    presented by Alexandra Wolf at the preliminary hearing, do you

6    remember that?

7    A.    Like I, like I testified with the Attorney General, Tim

8    was was very active and and very diligent in in keeping me

9    abreast of things he was concerned about and I I do recall

10   that that came up at some point but again, it wasn't anything

11   that that I was able to establish.

12   Q.    Okay.  And there was no attempt to determine if in fact

13   there were earlier statements that Tim woulda would've seen at

14   the time of the preliminary hearing that were different from

15   the statements that were actually ultimately used in in the,

16   in the prosecution.

17   A.    I can't recall specifically.  I I think that it wa --

18   when questions like that came up because Ms. Wolf is the one

19   that handles the preliminary hearings, I, my my normal

20   procedure would have been to have a conversation with her,

21   with her about it and see if she ---

22   Q.    Yes.

23   A.    --- had any -- anything that seemed unusual to her but I

24   can't tell you specifically.

25   Q.    I think there was an issue also that Tim brought to you

20

JAMES E. HATCHER - CROSS-EXAMINATION BY MR. MILLER

1    and that had to do with probly the most important witness and

2    that was Ms. Price and the fact that there was an

3    inconsistency as to which name she actually went by as opposed

4    to which name was signed on the witness statement, the Amy

5    Price versus Casey Price.  Do you recall that you did not

6    bring that out in Tim's defense at the time of the trial

7    either in cross-examining Ms. Price or any other point in

8    arguing this case?

9    A.    Well it it es -- I guess it escaped me then and escapes

10   me now as to ---

11   Q.    I believe they considered it in a -- at all points they

12   they listed her as a witness Casey Price but the statement was

13   signed Amy Price rather than Casey and didn't Tim bring that

14   to your attention that possibly he was concerned that that

15   wasn't Ms. Price's signature because the name was different,

16   it was signed Amy but yet she seemed to go by the name Casey

17   during the trial and even before the trial?

18   A.    Well I I'm sure he, I'm sure he certainly did bring that

19   to my attention, I I -- it just -- I I I guess I I missed his

20   point.  I I know that Casey was present to testify and she

21   identified herself as the one who was working at the Papa

22   John's, she identified herself as the one who was the --

23   interacted with the suspect and at no point did I get any

24   indication that there was some other Casey Price out there.

25   Q.    Also, the issue of scarring I believe you've already

21

JAMES E. HATCHER - CROSS-EXAMINATION BY MR. MILLER

1  mentioned.  I believe she alleged that the suspect had a

2  military-style haircut and there were specific car details

3  given, I believe a 92 Buick LeSabre.

4  A.   Right.

5  Q.   Those were things that actually ended up in the

6  newspaper, didn't they?

7  A.   I believe so, ---

8  Q.   There was a newspaper article ---

9  A.   --- correct.

10  Q.   --- that gave those but then the statement that she gave

11  didn't have those those details in it, did it, did it?

12  A.   Right, I I think the newspaper description also referred

13  to an older white male, ---

14  Q.   Um-hum, ---

15  A.   --- things like ---

16  Q.   Exactly.

17  A.   --- that.  Yeah.

18  Q.   But do you feel like those were brought out though, those

19  inconsistencies at trial what was alleged to have been a

20  description of the defendant or the the suspect versus obvious

21  differences in in in Tim's appearance?

22  A.   But like I said I I think certainly through through

23  Ms. Price, I I felt like I had zeroed in on that about as well

24  as I possibly could including having Tim come up and stand in

25  front of the jury so everyone could get a good look at him and

22

JAMES E. HATCHER - CROSS-EXAMINATION BY MR. MILLER

1   see that he didn't have any scars.

2   Q.   And I believe the same applied to Mr. Serig who I believe

3   was another one of the witnesses and then ---

4   A.   Right.

5   Q.   --- to a Mr. Carr and I believe Mr. Carr actually didn't

6   pick Tim in the photo lineup, did he?

7   A.   Right.

8   Q.   Now going to the incident report you did mention, of

9   course backing up, Mr. Hyde or Officer Hyde prepared the

10   initial report, correct?

11   A.   I believe so, yes.

12   Q.   And I believe Officer Hyde listed strong armed robbery

13   and did not list as -- a -- the name of a suspect, did did

14   he?

15   A.   That's my -- that's what I recall.

16   Q.   And if I'm not mistaken wasn't it outside the presence of

17   the jury that you brought to the Court in pretrial the

18   inconsistency between Hyde's statement and then Bradley going

19   and altering that statement ultimately putting Tim's name in

20   as if they knew from the very beginning that someone was

21   claiming this was Tim Wilbanks, knew it was Tim Wilbanks and

22   then erasing the word "strong" from that incident report?

23   A.   Correct.

24   Q.   That was done outside the presence of the jury, wasn't

25   it?

JAMES E. HATCHER - CROSS-EXAMINATION BY MR. MILLER

1    A.    Correct.

2    Q.    Unfortunately, am I correct that that was not brought out

3    in the jury's presence during the trial of this case?

4    A.    I can't say right now whether or not I was able to hit

5    every single point at trial that I did in in the suppression

6    hearing.

7    Q.    Okay, and in fact there was an issue and what mighta been

8    a very serious issue of Officer Bradley improperly altering

9    that report so that then when it was presented to the

10   magistrate it was as if they knew that Tim Wilbanks was the

11   su -- suspect and that it was an armed robbery case rather

12   than what the officer who prepared the original report put

13   which was suspect blank and strong armed robbery ---

14   A.    Right.

15   Q.    --- and that wasn't presented to either the Court or to

16   and certainly more important to the jury in considering the

17   veracity of that report.

18   A.    I think at least at the suppression hearing I was able to

19   establish through Bradley that he, that he had done some

20   changes prior to taking this to the, to the magistrate for a

21   warrant.

22   Q.    Yes, sir, but but trying to show the lack of honesty on

23   Bradley's part or trying to hurt his credibility, that didn't

24   go to the jury, did it?

25   A.    Maybe not on that specific point ---

24

JAMES E. HATCHER - CROSS-EXAMINATION BY MR. MILLER

1    Q.    Yes.

2    A.    --- but I can tell ya by the time officer Bra -- or

3    Detective Bradley got off the stand in fronta the jury, I felt

4    like we had minimized his credibility.

5    Q.    But not to the point of him possibly falsifying the

6    incident report.

7    A.    That may -- I may not have hit on that; I hit on some

8    other things.

9    Q.    Now the issue of the video that really was a peculiar

10   part of this case, wasn't it?

11   A.    Yes.

12   Q.    And in fact the State's case maybe didn't hinge on but an

13   important part of the State's case was that this car, this

14   stolen vehicle was parked I think within 15 feet right in

15   front of the the room where Tim was arrested, is that

16   correct?

17   A.    Correct.

18   Q.    Okay.  And once you finally determined that there was a

19   video because there was a stationary camera rolling, ---

20   A.    Right.

21   Q.    --- it was clear that there was no car parked right in

22   front of that -- the hotel room, wasn't it?

23   A.    Correct, I, what I recall establishing actually through,

24   may have been through Captain Hardy was that, was that I I got

25   he agreed that that there was not a vehicle right in front of

25

JAMES E. HATCHER - CROSS-EXAMINATION BY MR. MILLER

1    Tim's room, that in fact this vehicle that was reported stolen

2    was was some distance away.

3    Q.   And and did the State ever acknowledge that that was

4    wrong, that the car wasn't -- once that video came to light

5    and the video was played, did the State ultimately acknowledge

6    that that they they were wrong, that the car was parked some

7    distance in in in a lot away from the motel room?

8    A.   I d -- I think through their ini -- original testimony I

9    don't think they ever tried to place that vehicle right in

10   front of his room, I think they always placed it, ya know,

11   some, a little distance away but I think what we established

12   was that they had no clear connection linking Tim to that

13   vehicle.

14   Q.   Okay.  Do you remember that an Officer Bledsoe

15   transported Tim from the scene at the motel to the jail?

16   A.   I know he was transported, I didn't ---

17   Q.   Okay.

18   A.   --- know who ---

19   Q.   Okay, ---

20   A.   --- or I don't ---

21   Q.   --- so ---

22   A.   --- recall.

23   Q.   --- you were not aware that -- who that person was or

24   maybe you just don't recall today?

25   A.   Yeah, I'm sure I re -- I'm sure I remembered in ---

26

JAMES E. HATCHER - CROSS-EXAMINATION BY MR. MILLER

1   Q.   At the time ---

2   A.   --- 2003.

3   Q.   Okay.  You didn't call the officer who transported Tim

4   from the motel room to the jail as a witness in this case, did

5   you?

6   A.   Apparently I didn't.

7   Q.   And that o -- that that officer would've certainly been

8   able to establish where the car was located because he was

9   there at the scene transporting Tim and actually I guess that

10  was the video that was runnin' at the time, he was the officer

11  in the vehicle that was transporting Tim.

12  A.   Right, right but on the issue of where the vehicle was

13  located, I thought we, my recollection is we clearly

14  established that through at least one if not several officers'

15  testimony.

16  Q.   But didn't all of those witnesses testify that the

17  vehicle was right in fronta the room, I I think the transcript

18  may indicate within 15 feet of the room wherever that mighta

19  been?

20  A.   Right.  I guess that that may be I I'm getting the

21  impression now that the point I thought we were in agreement

22  on we're not in agreement.  I I thought it was fairly well

23  established that when I said the vehicle was not right in

24  fronta the room, it was still, it was some distance down but

25  it wasn't very far away.

27

JAMES E. HATCHER - CROSS-EXAMINATION BY MR. MILLER

1    Q.    Right.

2    A.    Now I -- so I did not get any concession from them at any

3    point that it was some further distance but I thought they

4    acknowledged it it wasn't right in fronta the room.

5    Q.    But in fact an Officer Bledsoe, the officer who

6    transported Tim from the motel to the jail, could have

7    actually shown the the prosecution was wrong in that the

8    vehicle that they claimed was a stolen vehicle by Tim was in

9    fact not close to the room at all.

10   A.    I I can't speak to that.

11   Q.    Okay.  You remember the Interstate Wrecker was involved

12   because that's where the vehicle came from?

13   A.    Right.

14   Q.    Do you recall that the folks at Interstate Wrecker, the

15   Parrish family, actually knew my client, ---

16   A.    That's correct.

17   Q.    --- had known him for years, ---

18   A.    That's correct.

19   Q.    --- actually had a a a good relationship with him,

20   thought thought a lot of Tim?  Well you didn't call the

21   Parrishes to testify in this case either, did ya?

22   A.    I don't recall.

23   Q.    Okay.  And in fact I believe that Mr. Pat Parrish woulda

24   been the person who moved that stolen car from the motel and

25   he could've also testified as to the placement of the car in

28

JAMES E. HATCHER - CROSS-EXAMINATION BY MR. MILLER

1  relation to the room and whether there really was a connection

2  between the two.

3  A.   Okay again, I I I felt like we effectively established

4  that that car was not in front of Tim's room.  I did not want,

5  I didn't wanna make any connection between this car and Tim, I

6  did did not feel like that would help us in the least and when

7  I was able to get them to acknowledge this car was not in

8  front of his room, I felt like our job was done.  Calling

9  people who would say Tim knew them and this was their vehicle

10 to me would not help.

11 Q.   Now I believe there was an issue also as to

12 identification of Tim at the motel itself, di -- and do you

13 remember that?

14 A.   Yes.

15 Q.   Okay.  Do you remember that Officer Bradley testified

16 that he got Tim's name from the the person who owned the Sun

17 and Sand Motel?

18 A.   Yes.

19 Q.   Do you remember ever bringing out an inconsistency

20 between that testimony of Officer Bradley and anyone else's?

21 A.   I remember having a back and forth about how they first

22 got, ya know, how how did Tim's name come up to start with and

23 and I remember and I don't know which officer it was but there

24 was some testimony that they'd gotten this name from the Sun

25 and Sand, beyond that I I can't today tell you how ---

JAMES E. HATCHER - CROSS-EXAMINATION BY MR. MILLER

1    Q.    Yes.

2    A.    --- I ---

3    Q.    Yes, yes.

4    A.    --- if I went further.

5    Q.    In fact Officer Turner contradicted Officer Bradley in

6    that Officer Turner said that they got Tim Wilbanks' name from

7    the people who knew him at the Interstate Wrecker Service, do

8    you not recall that?

9    A.    I believe -- yes, I believe there was some inconsistency

10   there.

11   Q.    Okay, and in fact you didn't argue that inconsistency to

12   the jury in this case, did ya?

13   A.    I may not have hit that one.

14   Q.    And you did not call Detective Hyde to potentially

15   impeach the report that Bradley had altered.

16   A.    I don't recall.

17   Q.    That would've showed in fact to the jury that Officer

18   Hyde didn't have a name and that Officer Hyde believed that it

19   was a strong armed robbery case rather than an armed robbery

20   case whoever the suspect woulda been.

21   A.    Right, right.  There were lots of inconsistencies in this

22   case, I can't tell you that I hit every single one of 'em, I

23   did hit a lot of 'em.

24   Q.    Yes.  Now the issue of the lesser included offense I

25   understand your position that as the trial was going on that

30

JAMES E. HATCHER - CROSS-EXAMINATION BY MR. MILLER

1    as the defendant when we came to that point at the beginning

2    of his case the offer was made and Tim rejected that offer ---

3    A.    Correct.

4    Q.    --- but when ya'll got to the end of this case you were

5    the attorney, correct, and ---

6    A.    Correct.

7    Q.    --- and Tim was the defendant ---

8    A.    Correct.

9    Q.    --- and when it comes to making decisions as to whether a

10   jury charge should be requested of the trial judge or not,

11   you're the lawyer.

12   A.    I, maybe I'm erroneous on this but my position has always

13   been that I'm the lawyer but the guy sittin' next to me is

14   gonna be the one servin' the time and so I take my client's

15   positions on that very seriously and I can tell you that

16   particularly in this case just the day previous to this or

17   that morning Tim had asked the judge for an opportunity to

18   address the Court and he launched into a long presentation on

19   all of the things that I was doing wrong and and I didn't know

20   if I was gonna be fired at that point but the judge heard him

21   out and then we continued on.  There were some things that Tim

22   and I disagreed about but I believe we were of one mind on the

23   issue of going up or down on armed robbery.

24   Q.    Do you recall that Judge Patterson actually was very

25   concerned when you asked him not to charge strong armed

31

JAMES E. HATCHER - CROSS-EXAMINATION BY MR. MILLER

1     robbery, ---

2     A.    I remember he ---

3     Q.    --- questioned it at that time?

4     A.    I don't know, I don't know if the -- if my impression was

5     he was very concerned; I remember we went through some

6     analysis and the judge was comfortable with the, with the

7     ultimate decision to not charge it but again, I may be

8     erroneous in this but my, a lot of my position on that was

9     based on what Tim's feelings were about it.

10    Q.    But do you not recall that because there was the issue of

11    possibly no constructive possession from the testimony that

12    was that Tim had his hands in the front of his pants that

13    Judge Patterson was concerned that that lesser included

14    offense ought to be charged and at that point Tim was

15    comfortable with that being charged?

16    A.    Hmm.

17    Q.    Do you not recall that?

18    A.    No, and I can tell ya at least in in the cases where I

19    was in fronta Judge Patterson if Judge Patterson was

20    uncomfortable about sumtin', I -- it was never my experience

21    that I could override his position on something; if he thought

22    something should be done, it was pretty much done.

23    Q.    Was ultimately your decision to ask Judge Patterson not

24    to charge the lesser included offense because you believed

25    enough evidence had been presented to contradict the State's

JAMES E. HATCHER - CROSS-EXAMINATION BY MR. MILLER

1    case and you believed that Mr. Wilbanks was gonna be found

2    innocent of this charge?

3    A.   That was certainly my hope but also just from a legal

4    standpoint it seemed rather, it seemed rather inconsistent to

5    me to we'd spent the entire case arguing that they got the

6    wrong guy when -- and our theory was never that, Oh, well

7    yeah, that was us but we weren't brandishing a weapon.

8    Q.   But whether it was Tim or not the issue of whether the

9    evidence that were presented of a weapon that really had come

10   into dispute, hadn't it, there really -- there rea -- whether

11   it was Tim ---

12   A.   Right.

13   Q.   --- Wilbanks or not --

14   A.   Right, ---

15   Q.   --- ya know, and ---

16   A.   --- and this this ---

17   Q.   --- and whether a jury would determine it was Tim or not

18   from the the evidence presented, ---

19   A.   Right.

20   Q.   --- clearly there was an issue of whether there was a

21   weapon on whoever the defendant should have been or whoever

22   the suspect was was still there.

23   A.   Right, and it may have just been poor strategy on my part

24   but again, I felt like we had effectively established that

25   they had the wrong guy so I I just, to me whether or not they

33

JAMES E. HATCHER - CROSS-EXAMINATION BY MR. MILLER

1    also carried through on on clearly establishing a weapon, I

2    mean, that that was never our focus but ---

3    Q.    You did focus on that, however, when you moved for a

4    directed verdict, do you recall that?

5    A.    Yes, I'm I'm sure that in seeking to diminish the State's

6    case that that woulda been one of the things I hit on.

7    Q.    Begging the cult's -- court's indulgence for just a

8    moment.  At no time did you ask the Court to consider

9    dismissing this case based upon what was believed to have been

10    falsification of that incident report by Bradley, is that

11    correct?

12    A.    That's correct.

13    Q.    And and wasn't it obvious that the original report before

14    being given to the magistrate had been altered?

15    A.    Well, when we use the word "altered", I I don't know if,

16    maybe it didn't didn't strike me as in the same way it did Tim

17    just that knowing that the way reports get routed up a chain a

18    command that that maybe there was some adjustments made to it

19    but I I didn't view it as some -- something nefarious or or

20    sinister.

21    Q.    Well they did white out the word "strong".

22    A.    And I think we we elicited that.

23    Q.    And it wasn't initialed as if they wanted everybody to

24    understand that they had altered the original report.

25    A.    Right, and I think I asked 'em about that.

34

JAMES E. HATCHER - CROSS-EXAMINATION BY MR. MILLER

1  Q.   And and in fact when they added Tim's name it still said

2  that the suspect had scars on the face.  You didn't bring that

3  out, did you?

4  A.   Bring that ---

5  Q.   Not to the jury.  In fronta the judge in pretrial you

6  brought it out but not in fronta the jury.

7  A.   Whether or not I zeroed in on that the word "scarring" in

8  the report, I can tell you that we clearly established to the

9  jury that the allegation was that this suspect had scars on

10  his face and I took the opportunity a -- once again to present

11  Tim as close as I could get him to the jury box so that

12  everyone could get a good look at him.

13  Q.   Yes, and just to to kind of wrap it up at this point, you

14  didn't call Officer Hyde to testify and you didn't bring out

15  the fact that the State didn't call Officer Hyde to testify

16  either, isn't that correct?

17  A.   If you're telling me that, I I'll take your word.

18  Q.   You don't recall?

19  A.   Again, I tried this case in 2003, ---

20  Q.   I understand.  I understand.

21  A.   --- I don't recall.

22  Q.   But you you recall that an officer prepared the original

23  report and then Officer Bradley made some changes or completed

24  it, however you want to characterize it.

25  A.   Right, right, I think we di -- I discussed that with

                              35

JAMES E. HATCHER - REDIRECT EXAMINATION BY MS. WHITE

1    Officer Bradley on the witness stand.

2    Q.   Okay.

3         BY MR. MILLER:  Your Honor, I believe that's all all I

4    have.  Thank you, sir, very much.

5         THE COURT:  Any redirect?

6         MS. WHITE:  Just briefly, Your Honor.

7    REDIRECT EXAMINATION BY MS. WHITE:

8    Q.   Mr. Hatcher, I just want to to follow up on a quick

9    question with you.  Generally, when you are representing a

10   client, you said that you actually give them your opinion,

11   your advice, at that situation do you make the decision for

12   the client as to whether or not they're gonna plead, what

13   the -- what they wanna do in regards to the case?

14   A.   No.

15   Q.   So any decision in regards to a plea offer, anything that

16   was goin' forward on, you relied on your client as the client

17   to make his own voluntary decision?

18   A.   Absolutely.

19   Q.   In regards to a jury charge for strong armed robbery in

20   your experience whether it's a drug case of -- if you've got a

21   defense of innocence, do you generally ask for a lesser

22   included charge?

23   A.   Not in my experience.

24        MS. WHITE:  That's all I have, Your Honor.

25        THE COURT:  Thank you, sir, you may step down.

36

MOTIONS AND MATTERS

1       (Whereupon, the witness left the stand.)

2       MS. WHITE:  The State has no other witnesses, Your Honor.

3       THE COURT:  Anything in reply?

4       MR. MILLER:  Nothin' in reply, Your Honor.  Thank you,

5   sir.

6       THE COURT:  Alright, my law clerk informs me ya'll made a

7   request to present briefs, is that correct?

8       MR. MILLER:  Just a summary that instead of doing a

9   closing argument to save time this morning, Your Honor.

10      THE COURT:  Alright, can ya'll have 'em to me in about

11  ten days?

12      MR. MILLER:  Absolutely.

13      MS. WHITE:  That will be fine, Your Honor.

14      THE COURT:  Thank you very much.

15      MS. WHITE:  Thank Your Honor.

16      MR. MILLER:   Thank you for hearing us today, Your Honor,

17  and for ---

18      THE COURT:  Um-hum.

19      MR. MILLER:  --- your indulgence yesterday, ---

20      THE COURT:  Sure.

21      MR. MILLER:  --- it was a tremendous help.

22      MS. WHITE:  And, Your Honor, if you need additional

23  copies of anything, I think your law clerk indicated you might

24  not have the full packet, I can do that.  I I provided the

25  transcript of the previous one but I'll be happy to make

37

MOTIONS AND MATTERS

1    copies for anything you need.

2        THE COURT:  If you would do that, that would be great.

3        MS. WHITE:  Okay.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3        I, Margaret A. Woods, Court Reporter in and for the State

4   of South Carolina at Large, hereby certify that I reported the

5   preceding case on June 17, 2011 at the time and place

6   heretofore set forth; and that the foregoing pages numbered

7   from 3 through 38, inclusive, constitute a true and accurate

8   transcription of my stenographic notes of the said proceeding.

9        I further certify that I am neither attorney nor counsel

10  for, nor related to or employed by any of the parties

11  connected to the action, nor am I financially interested in

12  the action.

13            March 25, 2012

14

15        _Margaret A. Woods_____

16            Margaret A. Woods, Court Reporter

17        in and for the State of South Carolina at Large.

18

19

20

21

22

23

24

25

                              39